E-FILED
Wednesday, 10 May, 2006  04:11:09 PM
Clerk, U.S. District Court, ILCD

# IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
### SPRINGFIELD DIVISION

| | | |
|---|---|---|
| TRACEY TRIGILLO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  03-3241 |
| | ) | |
| DONALD N. SNYDER, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## <u>OPINION</u>

JEANNE E. SCOTT, U.S. District Judge:

This matter comes before the Court on Defendants Donald N. Snyder, George DeTella, Walter A. Small and Nicholas A. Little's Motion for Summary Judgment (d/e 11).  The Plaintiff Tracey Trigillo worked for the Illinois Department of Corrections (IDOC) until November 15, 2001.  At that time, her term appointment was not renewed.  The Defendants were her superiors at IDOC.  She alleges that the Defendants retaliated against her by recommending against renewing her term appointment because she spoke out on matters of public concern regarding improprieties in the IDOC procurement process.  She brings this action under 42 U.S.C. § 1983 for violation of her First Amendment rights.  <u>Complaint (d/e 1)</u>, (Counts I-IV).

1

She also brings supplemental state law claims for tortious interference with her employment relationship (Counts V-VIII) and for violation of § 19(c) of the Illinois Personnel Code. 20 ILCS 415/19(c) (Counts IX-XII).  After this case was filed, the Illinois Supreme Court determined that § 19(c) does not authorize a private cause of action as a remedy for its violation.  Metzger v. DaRosa, 209 Ill.2d 30, 805 N.E.2d 1165 (Ill. 2004).  The § 19(c) claims, Counts IX-XII, are therefore dismissed.  For the reasons set forth below, the Court grants the Defendants' Motion for Summary Judgment on Trigillo's § 1983 claims and dismisses the state tortious interference claims for lack of subject matter jurisdiction.

## STATEMENT OF FACTS

Trigillo began working for the state of Illinois in 1993.[1]  She is a licensed attorney.  In 1999, she was working for the Illinois State Police (ISP).  She contacted Robert Powers, an attorney in the Governor's office, to request a transfer to a different agency.  Powers contacted Defendant Donald Snyder, then Director of IDOC.  He informed Snyder that Trigillo

---

[1]The Defendants dispute some of the factual statements set forth in this Opinion. The Court, however, must view the evidence presented in the light most favorable to Trigillo because she is the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

would be transferred to IDOC.  Snyder took this as a directive from the Governor's office to hire Trigillo.

Trigillo states in her deposition that she interviewed with Carl Becker of IDOC.  Becker was IDOC Deputy Director of Finance and Administration.  Powers and Snyder were present at the interview.  During this interview, Trigillo was offered the position of State Purchasing Officer (SPO) for IDOC.  Each agency had a person designated as its SPO.  The SPO was responsible for exercising purchasing authority under the Illinois Procurement Code (Code).  30 ILCS 500/1-15.105.  The Director of Central Management Services (CMS) was the Chief Purchasing Officer (CPO), responsible for purchasing matters governed by the Code, except in the areas of construction, transportation, and education.  30 ILCS 500/1-15.15.

Becker was then the SPO for IDOC.  He told her in the interview that she would be in training to be SPO:

> He said you'll be trained to be the state purchasing officer, you'll become that.  And he was currently that state purchasing officer.  And then he explained to me that I would be in charge of a procurement, and that my job was to help implement the Procurement Code throughout the agency and to talk with the Governor's office, Ben Bagby, and the persons at CMS who were responsible for procurements and help make some sense of some

3

of the stuff and help the comptroller's office.  He named several
places that I would be communicating with to, you know, work
out whatever procurement issues came up for the agency.

Motion for Summary Judgment and Supporting Brief (d/e 11) (Defendants'

Motion), Exhibit A, Deposition of Tracey Trigillo (Trigillo Deposition) at

17.[2]

Trigillo was interested in the position.  She was promised a 15 percent
raise.  She wanted to make sure she would not lose any of her fringe benefits
if she transferred from ISP to IDOC.  The ISP paid $700 worth of her dues
to professional organizations, paid her law license fees and paid her expenses
to attend professional conferences.  She was told that IDOC would provide
her with the same fringe benefits.  Id. at 16-17.  She ultimately agreed to
the transfer.

On May 5, 1999, the Governor's office approved a personnel action
request that transferred Trigillo to IDOC.  Defendants' Motion, Exhibit 1.
At that time she was in the middle of a four-year term appointment.
Persons on term appointments have no guarantee of renewal at the end of
the term.  She remained on the same term appointment which expired on
November 15, 2001.

_____

[2]As discussed infra, Bagby was an attorney at CMS.

Trigillo's original job description with IDOC, dated April 16, 1999, described her position as a Senior Public Service Administrator. The position was located in the Finance and Administration Division, Management and Budget Section, Procurement/Inventory Unit. Defendants' Motion, Exhibit 2A. The description set forth her primary duties as follows:

> Under administrative direction of the Sr. Public Service Adm., controls purchasing, contracts, real estate leasing, commodity and property inventories; establishes, implements and interprets policies and procedures, laws and rules and regulations regarding procurement and inventory; ensures compliance to State Purchasing Act, Property Control Act, CUSAS and other regulations; evaluates program and supervises and/or participates in studies; advises management on procurement and inventory issues and acts as primary liaison with the Department of Central Management Services and the Department's legal services in purchasing, contracts, real estate leasing and inventory matters; supervises staff.

Id. The job description further stated that the holder of the position, "Establishes, implements and interprets policies and procedures; directs and administers fiscal procedures through constant review of current procedures." Id. The position required the holder to be a licensed attorney. The job description was revised in January 2000, but the revisions did not change the description of the duties of the position. Defendants' Motion,

Exhibit 2.  Neither description indicated that the holder of the position would be the SPO for IDOC.

When Trigillo came to IDOC on May 16, 1999, she started working for Becker.  She was the Manager of Purchasing for IDOC.  She reported directly to Becker.  Becker also gave her the additional title of State Purchasing Officer Designee.  He told her that she would become the SPO when he left.  Trigillo and her staff reviewed contracts and procurements to make sure that the Code was being followed and transactions were being done properly.  She and her staff reviewed IDOC procurement directives to make sure they were current and complied with the new Code.  <u>Trigillo Deposition</u> at 82.  She advised the relevant persons at IDOC when contracts should be rebid rather than extended.  <u>Id.</u> at 102-03.  She made recommendations on how the Code should be followed and how a particular procurement should be done.  She sometimes explained how the Code should be applied.  <u>Id.</u> at 126.  As part of her duties, she also often spoke with individuals at CMS about procurement issues.  <u>See Memorandum of the Plaintiff, Tracey Trigillo, in Opposition to the Defendants' Motion for Summary Judgment (d/e 15, 16, & 17) (Plaintiff's Response)</u>, Exhibit 1, <u>Affidavit of Tracey Trigillo</u>, ¶ 83.  In particular, she often communicated

with Ben Bagby and Jay Wavering.  Bagby was an attorney at CMS.
Wavering was the Assistant Chief Purchasing Officer.  Both men regularly
fielded questions from state agencies regarding procurement issues.

When she arrived at IDOC, she did not receive the promised
compensation package.  IDOC gave her a 10 percent raise, rather than the
promised 15 percent, and would not pay her professional dues or law license
fees.  IDOC did pay for the cost of attending one professional conference.

In February 2000, Defendant Walter A. (Tony) Small took over
Becker's position as Deputy Director.  At the time that Small became
Deputy Director, Defendant Nicholas Little was Chief Fiscal Officer for
IDOC.  He was also a Senior Public Service Administrator.  Trigillo was still
Manager of Procurement.  Small had Trigillo report to Little, and Little
reported to Small.

Shortly before Small became Deputy Director, Trigillo spoke to
William Ghesquire, a legal counsel in the Governor's office about her
position.  Ghesquire told her that Small would become the Deputy Director
and SPO:

Uhm, Mr. Ghesquire again, for some reason he called me and

told me Tony Small was going to be the deputy director or either that I was talking to him about a procurement issue and he mentioned that Tony Small would be our new deputy director and that he was going to be the SPO.  And, you know, when Tony came in, that I should talk to him at some point about me being the SPO, you know.  And once Tony got to know my work, something would probably happen.  So when Tony got there, I went over and had a meeting with him and explained that stuff to him.

Trigillo Deposition at 42.  Trigillo met with Small in the beginning of February 2000 to discuss her situation.  During that conversation, she explained her duties to Small and her understanding that she would be the SPO.  According to Trigillo:

[H]e didn't know if he was the SPO or not at the time.  And so we talked about everything.  And we had a conversation, and I explained to him that these other things were supposed to be paid, the licensing fees and all this other stuff.  And I was told they would be.

Trigillo Deposition at 43.  About a week later Small called Trigillo into his office for another conversation.  At that time, Small told Trigillo that he was going to be the SPO:

And then about a week later Tony called me in his office.  He was very sarcastic, and he said things to me such as I'm the state purchasing officer, the director wants me to be it.  But he was -- his tone was sarcastic, and he said things about the other things we discussed.  He said, showed me a letter that the agency had sent out that they weren't going to pay anybody's dues, professional dues or whatever, they were going to examine them

> on a case by case basis kind of thing.  And he said didn't you get this letter?  And I said, yeah, but I didn't think it applied to my situation because they agreed to pay those things.  So but it was -- the tone had changed tremendously within that week when he called me back in.

Id. at 43-44.

In March or April 2000, a person on Trigillo's staff named Dave Dankoski spoke to her in the hallway, "so that everyone in the cubicles could all hear him."  Id. at 49.  Dankoski told Trigillo:

> [The] Comguard [contract] was not properly bid and that they changed the scores, that they set up a show and tell kind of thing for scoring, judging; and that the guts of the electronic monitoring devices even fell out on the table, and they still got the contract.  And he said he had copies of the documents in boxes behind his desk there in his office.  And that my predecessor had gone through his office and taken things off his desk and other areas and burned them, but he still had those documents.

Id.  Trigillo knew that staff members David Daily, Liz Hayes, and Patty Troxell overheard Dankoski.  Id. at 50.

The next morning, Trigillo contacted the FBI to report what Dankoski had told her.  She explained her motivations in her deposition:

> Well, a duty as a citizen, a duty as chief of procurement, you know, as lawyers we're supposed to be keepers of the state's coffers.  So I felt I had several duties.  But I also didn't want to lose my law license over continuing a contract that maybe should or shouldn't have been done.  And I had no way of

> knowing whether it should or not.  I wasn't there originally.  I
> don't know if anything Dave Dankoski said was true or false.
> Better to put it into proper hands and let them look at it and
> see.

Id. at 54.

Later that day, FBI agents appeared at IDOC offices to speak to Dankoski.  Trigillo and Little were in a staff meeting at the time.  The FBI started taking boxes out of Dankoski's work area.  Little told Trigillo to interrupt the FBI agents.  Trigillo interrupted the agents and asked them to meet with Small.  The agents then met with Small, Little, Trigillo and Missy Stutler.  Stutler was another IDOC Deputy Director.  Id. at 58-60.  After the meeting, Trigillo was instructed to walk the FBI agent out of the building.  After she did so, Trigillo returned to Small's office.  There was a meeting going on in his office behind closed doors.  Trigillo was told to wait outside of the meeting for several minutes.  When she was let in, Missy Stutler said to Trigillo, "[M]y, you were awfully chummy with the FBI agent."  Id. at 59-60.  Trigillo responded that she had known the agent since they were kids.  Small said that from now on, any contacts with the FBI would go strictly through Little.

Trigillo did not tell anyone that she had contacted the FBI.  Trigillo

subsequently provided additional information to the FBI agents.  She again did not tell anyone that she was providing this information to the FBI.  Id. at 60-62.  Later in April 2000, Lynette Jones, Snyder's Chief of Staff, told her that Snyder had no intention of making her the SPO.  Id. at 44.

During her tenure at IDOC, Trigillo often advised Little and Small that IDOC was not following proper procedures in awarding, renewing, or extending contracts.  She also communicated with representatives of CMS, primarily Bagby and Wavering, regarding these issues.  Little and Small often were upset by Trigillo's comments and criticisms regarding various contracts and procurement issues, and her discussion of these issues with persons outside of IDOC.  They regularly called her into Small's office on Friday afternoons to discuss these matters:

> Uhm, as I would try to make recommendations for procurement issues, each time that I did, I was called in to regular sessions every Friday or so, pretty close to every Friday, with Nick and Tony.  In fact, my staff joked and would say people are messing with me; and they called them my whipping sessions.  And I would go over there, and they would like question me extensively about procurement issues.  And I would oftentimes say if you don't believe me, why don't you pick up the phone and call Ben and Jay.  We don't call them, we don't work for them.  And it was obvious it was harassment.
>
> So each time I pointed something out, like Tony tried to change the stores on something which changed a vendor, they did

something improper by re-bidding something a different way to get a certain vendor.  Every time that they did something like that and I pointed it out, they would get madder and madder.

Id. at 140-41.

On November 2, 2000, Trigillo sent a memorandum to the Illinois Attorney General and the CPO at CMS.  Defendants' Motion , Exhibit 18, Memorandum dated November 2, 2000 (50-40 Memorandum).  The Subject of the 50-40 Memorandum was, "Report in Compliance with 500 ILCS 50-40."  Section 50-40 states:

> Reporting anticompetitive practices.  When, for any reason, any vendor, bidder, contractor, chief procurement officer, State purchasing officer, designee, elected official, or State employee suspects collusion or other anticompetitive practice among any bidders, offerors, contractors, proposers, or employees of the State, a notice of the relevant facts shall be transmitted to the Attorney General and the chief procurement officer.

30 ILCS 500/50-40.  Trigillo understood that she was obligated to report these matters under § 50-40:

> Uhm, my understanding is the Procurement Code required, the new Procurement Code required any person who suspected any type of problems with procurement, they had a duty to report it.  And the term actually used in the code, I don't know if it still says this, but was the word suspect.  It didn't say if you had proof or if you had knowledge of it.  But you could report it. And if you didn't, you could be disciplined up to discharge.  So my staff and I as state employees had that duty.  So whenever I had a question about something, gray area, then I would call

CMS.  Or if it was black and white and I was telling Corrections and telling Corrections and couldn't get them to do it, then I would tell CMS.  But I also met with Shawn Denney and a female attorney at the AG's office to discuss generally.  And there was no requirement it be in writing was my understanding. But I think at some point I put it in writing.  And it may have been at the request of Mr. Denney.  I am not sure.  And then I delivered it to Mr. Denney's office and to CMS.

Trigillo Deposition at 113-14.  The introduction of the 50-40 Memorandum

states:

Dear Attorney General and CMS Chief Procurement Officer (CPO):

In compliance with 500 ILCS 50-40, please be advised of Illinois Department of Correction (IDOC) Procurements, which may need to be reviewed.  I do not make any criminal or other accusations against anyone.  Some Procurements or processes related thereto may have been unfair or otherwise unwise and need to be reviewed.  While I have discussed issues with Ben Bagby of CMS Legal as these arose and received good legal advice on these and related issues, IDOC may need formal guidance in these areas.

50-40 Memorandum at 1.  Trigillo then listed 13 separate issues.  The first

issue concerned the awarding of a comprehensive health care contract for

IDOC District 3.  The contract was awarded to the contractor that finished

third in the competitive bidding process.  The 50-40 Memorandum stated,

"The medical program review committee for District 3 appeared to take

experience and references into account in reviewing proposals."  Id.  This

section of the 50-40 Memorandum concludes:

> A review will provide future guidance for the award of major dollar contracts to assure compliance with Procurement and Criminal laws at all times.  Purchase of Care is exempt from the Code.  Once the competitive bidding processes have begun, strict compliance with the Illinois Procurement Code may not be necessary, but isn't what is in the State's best interests with respect to these contracts with or without bidding still necessary?

Id. at 2.

The second issue concerned another health care contract.  In this case, bidders responded to a Request For Proposal (RFP).  The first sentence of this section of the 50-40 Memorandum states: "The award for this RFP appears to be consistent with the law."   Id. at 3.   Trigillo, however, expressed concern that someone disclosed the identity of the three top bidders before the final contract was awarded.

The third issue concerned awarding future medical contracts.  Trigillo stated that "one of my supervisors who is the State Purchasing Officer (SPO) stated, in the presence of others, that this particular vendor was going to get one of these RFPs.  These have not even been published to submit proposals to date."  Id.

The fourth issue concerned a mail room contract.  Trigillo stated that

14

a member of her staff checked with CMS regarding the transaction:

> He was advised that if vendor gave letter to CMS that all state agencies could have this deal, transaction was ok.  Copy of alleged letter was nowhere to be found.  To my knowledge, this transaction has not been properly resolved to date.   The described letter does not address improper divulging of the other party's bid information in the first instance.

Id. at 3-4.  Trigillo also questioned in this section why a mail room in East Moline did not have an equipment contract in place.  This section of the 50-40 Memorandum concluded, "Whose equipment is being used during this two (2) months and why has this not been put out for formal bid?"  Id. at 4.

The fifth section concerned vending machine contracts.  The section states in part:

> Vending has not been bid out at all facilities and there was no mechanism in place for blind preference pursuant to law. . . . This problem may become moot but is not at present.  Vending is under current audit and/or review.

> IDOC has arranged a meeting with DHS to see about the blind getting a contract for the facilities.   What procurement guidelines, if any, need to be met?  While IDOC can contract with DHS outside of the Illinois Procurement Code, the blind persons and their companies will be the persons who will profit.

Id.

The sixth issue concerned a contract with a company called Acculab

Medical Testing, Inc.  This section states in part:

> I advised Acting Director this was one of those contracts that should never have been.  Bid was for NIDA-certified.  Smith-Kline was low bidder and NIDA-certified. Acculab was not NIDA-certified and not low bidder.  Piece was carved out for Acculab.  During FY00, I questioned amendments coming through for large amounts to this vendor.  I advised Nick Little and others we could extend to pay for what was already used but vendor was to be notified that contract was canceled.  Nick Little did not cancel . . . .
>
> At start of FY01, another amendment to extend the contract came through.  I stopped it.  My staff took it to Nick Little and advised I would not process these extensions and they were told to quit.  Nick Little advised my staff he was trying to stop this. I spoke with the program person to explain why COD was being rejected.  He stated Nick Little told him to extend it and process it the end of June, 2000.

Id. at 4-5.

The seventh issue concerned a contract with a company called Stadtlander Drugs.  This section states in part: "Extensions needed to be rebid.  Months of my objecting to extensions and telling them it needed to be rebid. . . .  DD Small later decided we would bid this out and extend only during time to bid."  Id. at 5.

The eighth issue concerned a health care contract at a correctional center.  This section states: "Same issue as Stadtlander.  Continued extensions without rebidding but allowing the annual increases.  I continued

to advise this was against my recommendation.  This is now being bid this year."  Id.

The ninth section asked for an interpretation of a statutory section: "30 ILCS 105/9.02(a)(1) requires the signatures of the chief legal counsel, chief fiscal officer, and the director and not their designees."  Id.  This section of the 50-40 Memorandum concludes: "Is the statute referring to a particular title or function?  Who is the proper party to give the required signature?  Is IDOC in compliance with law currently?"  Id.

The tenth section is entitled: "Inmate Services."  The section states: "Car wash issues.  I have attempted to bring this to the attention to management for review."  Id.

The eleventh issue concerned a company called TASC.  This section of the 50–40 Memorandum states:

> I made recommendation for three (3) separate RFPs, federal and state funds, combined in one recommendation for a facility.  I was called into a private meeting and told Director wanted to award all to TASC.  I advised this could not be done as TASC did not even bid on two parts of this award.  I was advised to review my recommendation and resubmit it to see what can be done.
>
> TASC bid on a testing instrument contract for $58,000 for one program.  I advised we could not increase the contract by amendment for $200,000 to offer the instrument to another

program.  The $200,000 contract should independently bid.

Id. at 6.

The twelfth section is entitled "PrimeCoat."  The section states that a draft of a bid specification required use of a name brand product called PrimeCoat to seal showers.  Only one vendor used this name brand product. The 50-40 Memorandum states: "I added 'or approved equal' to the specs and eliminated what I new [sic] to be specific to that vendor on this and subsequent bids.  I was subsequently called into meetings to address what was perceived to be my insubordination on this issue."  Id.

The last section is entitled: "Small Business Laws and Other Laws." This section states:

> Capital Program Unit (CPU) did not follow these laws and I constantly addressed this with the facilities and CPU.  Not long ago, a CPU employee told a facility, "We don't care about that." Further, CDB [Capital Development Board] has a few issues including CPU exceeding its delegated authority without proper delegation by CDB.

Id.

> The 50-40 Memorandum concludes:

> To resolve these and other issues, Procurement records and staff are available to you.  I hope that your agencies can lead IDOC in a direction to better knowledge and understanding of the Procurement processes.  I think many of these issues were

resolved after repeated instances of bringing it to the attention of persons making the decisions.  However, some issues and/or transactions remain unresolved.  Further, I am willing to look at what errors, if any, I have made in giving legal advice for the benefit of future procurements.

In keeping with my statutory duties pursuant to the Procurement Code, I hope there are adequate safeguards against retaliation for doing what the law requires.

Id.

On November 30, 2000, Michael Schwartz, the Director of CMS, wrote a letter to Director Snyder informing him of the 50-40 Memorandum. Plaintiff's Response, Exhibit 10.  Schwartz referred the matter to Bagby to investigate.  Snyder referred the matter to Small who, in turn, referred the matter to Little.

Bagby investigated each issue separately and reported to Schwartz on each.  Bagby did not remember at his deposition if he reported orally or in writing.  Plaintiff's Response, Exhibit 2, Bagby Deposition at 42.  Bagby recalled that, with respect to the ninth issue, that IDOC might need to clearly identify who is its Chief Fiscal Officer.  He also remembered that he concluded that the car wash issue was not a procurement issue governed by the Code.  Id. at 43-44.  The vending machine contract with the blind and the contracts for health care services also were not procurement issues

governed by the Code.  Id. at 44-46.  Neither party has submitted any evidence of any other findings related to the investigation of the 50-40 Memorandum.  On February 6, 2001, Little sent a memorandum to the managers in his section, including Trigillo.  The memorandum stated that all procedural correspondence and all correspondence pertaining to departmental policy must be reviewed and approved by him.  Plaintiff's Response, Exhibit 11.

Throughout 2001, Trigillo continued to make recommendations to Little and to Small regarding various procurement issues.  She also continued to communicate with representatives of CMS regarding these issues, principally Bagby and Wavering.  She continued to advise Small and Little that numerous transactions were not being done properly.  She wrote memoranda regarding various transactions.  See Plaintiff's Memorandum, Exhibits 21, 22, 25, 31, 33.  On September 4, 2001, Small ordered her not to contact representatives of CMS without speaking to him first.  She thought this was peculiar since her job duties required her to communicate with CMS and other agencies regarding procurement matters.  Trigillo Affidavit, ¶¶ 82-83.

On September 6, 2001, Trigillo sent a handwritten note to Robert

Newtson in the Governor's office.  The note stated:

> I would like to make a [sic] appointment with Kevin Wright
> and/or you to discuss.  I am being targeted by IDOC for non-
> renewal of my SPSA term appointment.  I have been
> professional in the discharge of my duties, administratively and
> legally.

<u>Defendants' Motion</u>, Exhibit 55.

Around this time, Small directed Little to prepare a memorandum regarding renewal of Trigillo's term appointment.  Little's memorandum stated in its introduction, "The following list provides a number of issues and reasons to consider in the reappointment of Tracy Trigillo." <u>Defendants' Motion</u>, Exhibit 14.  The memorandum lists four bullet points with sub-points.  The bullet points: (1) questioned her loyalty to the IDOC and the Administration in performing her duties; (2) stated that she provided questionable counsel regarding procurement rules, misinterpreted issues, and misrepresented information and counsel provided by others; (3) stated that she tended not to be a team player with fiscal agencies and with IDOC; and (4) stated that she has been overzealous in her interpretation and application of procurement rules which caused delay and confusion in processing contracts and procurements.  <u>Id.</u>  The memorandum concludes:

The issues presented as well as other less significant issues have

> adversely affected the effectiveness and cohesiveness of our procurement operations within the agency.  There has evolved an environment of mistrust, bias and inadequate communication which is largely due to Ms. Trigillo's attitude, communication style, management techniques and personality traits.

Id.  Small and Little recommended that Trigillo's term not be renewed. Snyder relied on their recommendations.  On October 9, 2001, he signed the Agency Request recommending that Trigillo's term not be renewed.  The Governor's office approved this request October 12, 2001.  Defendants' Motion, Exhibit 13.  On October 29, 2001, Snyder sent Trigillo a letter informing her that her term would not be renewed.  Plaintiff's Response, Exhibit 15.  Trigillo then brought her action on October 27, 2003.

## ANALYSIS

The Defendants move for summary judgment.  To prevail, the Defendants must present evidence that demonstrates the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).  The Court must consider the evidence presented in the light most favorable to Trigillo.  Any doubt as to the existence of a genuine issue for trial must be resolved against the Defendants.  Anderson, 477 U.S. at 255.  Once the Defendants have met their burden, Trigillo must present evidence to show that issues of fact remain with respect to an issue essential

to her case, and on which she will bear the burden of proof at trial.  Celotex Corp., 477 U.S. at 322; Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).[3]

Trigillo claims that Defendants Snyder, Little and Small retaliated against her for speaking out about IDOC's improper procurement methods, by recommending that her term not be renewed.  She claims these actions violated her constitutional right to freedom of speech under the First Amendment.  To prevail on this claim, Trigillo must first establish that her conduct was constitutionally protected speech.  Thomsen v. Romeis, 198 F.3d 1022, 1027 (7th Cir. 2000).  To be constitutionally protected: (1) Trigillo must have spoken as a citizen on a matter of public concern, and (2) Trigillo's "interest in expressing herself on this matter outweighs any injury the speech could cause to the State employer's interest 'in promoting the

---

[3]The Defendants argue initially that Trigillo's § 1983 claim is barred by the statute of limitations.  Section 1983 claims in Illinois are subject to a two-year statute of limitations.  Licari v. City of Chicago, 298 F.3d 664, 667-68 (7th Cir. 2002).  Trigillo commenced the action on October 28, 2003, within two years of when she received the October 29, 2001, notice that her term would not be renewed.  Her claim is not barred by the statute of limitations.  The Defendants argue that she knew that her term would not be renewed on September 6, 2001, when she wrote Newtson for help because she believed she was being targeted for non-renewal.  At that time, however, IDOC had not yet recommended non-renewal of her term; thus, the tortious conduct had not occurred.  A jury could conclude that the alleged tort was complete when she received notice on October 29, 2001.  The Defendants are not entitled to summary judgment based on the statute of limitations.

efficiency of the public services it performs through its employees.'" <u>Wright v. Illinois Dept. of Children & Family Services</u>, 40 F.3d 1492, 1500 (7th Cir. 1994) (quoting <u>Waters v. Churchill</u>, 511 U.S. 661, 668 (1994)).   To determine whether Trigillo's speech addressed a matter of public concern, the Court must consider its content, form, and context.  <u>Connick v. Myers</u>, 461 U.S. 138, 146 (1983).

If Trigillo's speech touched a matter of public concern, the Court must determine whether the State's interests in promoting the efficiency of public services outweighed Trigillo's interest in commenting on these matters.  The Court must make the determination of appropriate balancing of these factors, "as part and parcel of our authority to determine the meaning and application of the First Amendment."  <u>Wright</u>, 40 F.3d at 1502.

Trigillo's speech must have also been a substantial factor or motivating factor in the Defendants' decision to recommend non-renewal of her term. <u>Spiegla v. Hull</u>, 371 F.3d 928, 941 (7th Cir. 2004).  If Trigillo makes such a showing, the Defendants must show by a preponderance of the evidence that they would have taken the same actions even in the absence of the protected conduct.  <u>Mt. Healthy City School Dist. Bd. of Educ. v. Doyle</u>, 429 U.S. 274, 287 (1977).

In this case, Trigillo was a policymaker for IDOC. Her job description states that she had the authority to formulate and implement IDOC policies. The Defendants were entitled to rely on the job description that she had policymaking authority unless evidence indicates that the process for formulating the job description was unreliable. Riley v. Blagojevich, 425 F.3d 357, 361 (7th Cir. 2005). No evidence indicates that her job description was, somehow, improperly manipulated. Thus, the Defendants were entitled to treat her as a policymaker.

Trigillo attempts to distinguish the Riley decision, but the Court is not persuaded. The Riley opinion analyzed the Seventh Circuit precedent in this area in detail. Id. at 359-61. The Court stated that, "These cases . . . refer to the importance of providing guidance to litigants." Id. at 361. The Court then analyzed the state of Illinois' process of checks and balances designed to create and maintain accurate job descriptions. The Court concluded:

> With these checks and balances designed to make the official job description accurate, the state is entitled to rely on it to reveal the scope of the job holder's duties and enable the court to determine whether the duties bring the job into the circle within which elected officials are entitled to demand political loyalty.

Id. at 362.  The <u>Riley</u> Court further stated that such a job description was a "provisional safe harbor" for state officials.  Id. at 365.  The Seventh Circuit intended to provide guidance to state officials, such as the Defendants, that they were entitled to rely on Illinois state job descriptions. Here, Trigillo's job description stated that her position had authority to formulate and implement policy.  Trigillo was a policymaker for First Amendment purposes.

Because she was a policymaker, the Defendants had the right to expect a higher degree of loyalty from her and to dismiss her if she spoke out "on a matter of public concern in a manner that is critical of superiors or their stated policies."  <u>Vargas-Harrison v. Racine Unified School Dist.</u>, 272 F.3d 964, 971 (7th Cir. 2001).  "[T]he government employer's need for political allegiance from its policymaking employee outweighs the employee's freedom of expression to such a degree that it obviates *Pickering* balancing." <u>Bonds v. Milwaukee County</u>, 207 F.3d 969, 977 (7th Cir. 2000).  Thus, a policymaker has no First Amendment right to criticize her superior's work-related policies.  Id.  Speech regarding matters of public concern unrelated to politics or policymaking, such as speaking out concerning an abuse of an office, is still protected.  Id. at 979.

Trigillo has presented evidence of three types of speech: (1) she reported Dankoski's story about the Comguard contract to the FBI; (2) in the course of her duties, she communicated with Small, Little, others at IDOC, and representatives of CMS regarding various transactions that were improper; and (3) she sent the 50-40 Memorandum to the Illinois Attorney General and the CPO at CMS.  A jury could conclude that the information reported to the FBI was a matter of public concern.  She reported allegations of falsification of bid documents and destruction of evidence; she was not criticizing policies.  She did so, at least in part, out of a sense of duty as a citizen.  See Belk v. Town of Minocqua, 858 F.2d 1258, 1263 (7th Cir. 1988).  Under the circumstances she spoke to the FBI as a citizen on a matter of public concern unrelated to policy criticisms.

Trigillo was not speaking as a citizen on matters of public concern, however, when she gave advice and counsel to Little, Small, and other members of IDOC regarding various IDOC transactions, and when she communicated with representatives of CMS regarding these transactions. She did this as part of her regular job duties.  This speech was not constitutionally protected. Gonzalez v. City of Chicago, 239 F.3d 939, 941 (7th Cir. 2001).

Finally, the 50-40 Memorandum raised several policy disputes between Trigillo and Little and Small, but some of the issues raised could be considered matters of public concern.  The introductory paragraph states that she was not accusing anyone of violating the law; rather, she was concerned that some procurement processes "have been unfair or otherwise unwise and need to be reviewed."  50-40 Memorandum at 1.  This statement indicates that Trigillo was not raising issues of misconduct, but rather, that she was criticizing her superior's decisions that she found to be unfair or unwise.  She also stated in the introduction that "IDOC may need formal guidance in these areas."  Id.  In the conclusion, she stated, "I hope that your agencies can lead IDOC in a direction to better knowledge and understanding of the Procurement processes."  Id. at 6.  These statements are clearly critical of her superiors at IDOC, presumably Little and Small; the statements indicate Little and Small did not know what they were doing and needed direction and guidance.

Trigillo's first, second, third, eighth and eleventh (and possibly the sixth and seventh) issues concerned the manner in which medical care contracts were handled. Trigillo, however, states in the 50-40 Memorandum that these contracts are exempt from the Code.  50-40 Memorandum at 1.

Bagby confirms this.  Bagby Deposition at 46.  Thus, she was not concerned about compliance with the Code.[4]  Rather, she stated that the current IDOC procedures cost the state money.  50-40 Memorandum at 1.  This was a criticism of IDOC policy in this area.

Similarly, in the fifth issue, she objected to negotiating with DHS on vending contracts without following the Procurement Code procedures.  She stated that IDOC may do so legally, but again argued that this will cost the state money.  Id. at 4.  She was again criticizing IDOC policy.

Some of the matters raised, however, could be issues of public concern.  For example, the second and fourth issues stated that confidential information was disclosed to certain bidders during the bid process.  The third issue quoted Small (identified as IDOC's SPO) as saying that a particular vendor would receive future medical service contracts before any notices regarding future contracts had been published.  The fourth issue also stated that Little improperly extended certain mail room contracts.  Thus, at least some of the issues in the 50-40 Memorandum could have been speech related to improper conduct rather than criticisms of policy.  These

---

[4]She also states in the second issue that the transaction in question complied with law.  50-40 Memorandum at 2.

statements could be about matters of public concern rather than policy criticisms.

The Court, however, must determine whether the State's interests in promoting the efficiency of public services outweighed Trigillo's interest in speaking on these matters in this fashion.  <u>Wright</u>, 40 F.3d at 1502.  The Court must make this determination as a matter of law.  <u>Vukadinovich v. Bartels</u>, 853 F.2d 1387, 1389 (7th Cir. 1988).

The Court concludes that the State's interest outweighed Trigillo's interest in this circumstance.  Much of the 50-40 Memorandum concerns policy disputes.  Trigillo did not think that any of the issues concerned criminal or intentional wrongdoing; rather, she stated that the errors reflected a lack of understanding by IDOC officials about the procurement process.  <u>50-40 Memorandum</u> at 1, 6.  <u>Cf.</u> <u>Marshall v. Porter County Plan Com'n</u>, 32 F.3d 1215 (7th Cir. 1994) (policymaker spoke out about abuses in office).   Furthermore, many of the issues raised had already been resolved.  <u>50-40 Memorandum</u> at 6.  She, thus, was speaking out about acts that were, at worst, done negligently out of ignorance, many of which only implicated policy disputes, and many of which had already been resolved. In such a situation, the State's interest in Trigillo's loyalty as a policymaker

and its interest in promoting efficiency in the public services it provided outweighed her interests in speaking out on these issues. The 50-40 Memorandum was not protected speech under these circumstances.[5] Only the report to the FBI was protected speech.

Next, Trigillo must present evidence that her statements to the FBI were a motivating factor in the recommendation not to renew her term. She has no evidence of this. She did not tell anyone that she reported this matter to the FBI. She presented no evidence that the Defendants knew that she had reported the matter to the FBI. Dankoski made his statement to Trigillo in the hallway where any number of people heard it. Trigillo identified three people specifically who heard it. There were numerous people who could have reported it the FBI. Stutler commented that she was chummy with the FBI, but Stutler is not a defendant here.[6] Furthermore,

---

[5]Even if the 50-40 Memorandum was protected speech, the Defendants would be entitled to qualified immunity because Trigillo has not cited a case that clearly established that a policymaker's written memorandum is protected speech when the memorandum contains both criticisms of superiors' policies and matters of public concern. Harlow v. Fitzgerald, 457 U.S. 800 (1982). The Defendants, thus, would not be on notice that they could not discharge her for criticizing her superior's policies. See Vargas-Harrison, 272 F.3d at 974 (policymaker may be discharged for criticizing policies).

[6]Her statement is also inadmissible hearsay, at least with respect to the claims brought against the Defendants in their individual capacities.

Stutler's statement is ambiguous.   Snyder's Chief of Staff Jones subsequently told Trigillo that the Director did not intend to make her the SPO, but Small had already told Trigillo in February 2000, before the FBI incident, that the Director wanted him to be the SPO, not her.  Trigillo is speculating that the Defendants thought she reported this matter to the FBI.  Speculation is not sufficient to overcome summary judgment.  <u>Borcky v. Maytag Corp.</u>, 248 F.3d 691, 695 (7th Cir. 2001).  Since she has no evidence that the Defendants believed that she spoke to the FBI, she has no evidence that the incident was a motivating factor in the decision not to renew her term.

Trigillo, thus, has failed to present evidence to show that issues of fact remain with respect to an issue essential to her § 1983, and on which she will bear the burden of proof at trial.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. at 322.  The Defendants are entitled to summary judgment on the § 1983 claim.[7]   The Court declines to exercise jurisdiction over the state law

---

[7]In addition, she has not demonstrated any personal involvement by Defendants Snyder and DeTella.  An individual must be personally involved to be liable under § 1983.  <u>Jones v. City of Chicago</u>, 856 F.2d 985, 992 (7th Cir. 1988).  Trigillo agrees that DeTella was not involved and is not liable.  <u>Plaintiff's Response</u> at 1 n.1.  The evidence regarding Snyder indicates that he had little or nothing to do with Trigillo.  When the reappointment issue arose, he merely followed the advice of the supervisors in her chain of command, Little and Small.  There is no evidence at all that Snyder either acted out of a desire to retaliate against Trigillo, or that he knew that Little and Small acted out

tortious interference claims.

THEREFORE, Defendants Donald N. Snyder, George DeTella, Walter A. Small and Nicholas A. Little's Motion for Summary Judgment (d/e 11) is ALLOWED. Counts IX-XII of the Complaint (d/e 1) are dismissed for failure to state a claim. Summary judgment is entered in favor of Defendants Donald N. Snyder, George DeTella, Walter A. Small and Nicholas A. Little and against Plaintiff Tracey Trigillo on Counts I -IV. The Court dismisses Counts V-VIII for lack of subject matter jurisdiction. All pending motions are denied as moot. This case is closed.

IT IS THEREFORE SO ORDERED.

ENTER:   May 10, 2006.

FOR THE COURT:

s/ Jeanne E. Scott
_____
JEANNE E. SCOTT
UNITED STATES DISTRICT JUDGE

---

of a retaliatory motive.